IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JOHN RANDOLPH DUPREE, SR., | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. 10-351-LPS |
| CORRECTIONAL MEDICAL SERVICES et al., | : | |
| Defendants. | : | |

John Randolph DuPree, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

Chad J. Toms and Daniel A. Griffith, Esquires, Whiteford, Taylor & Preston, L.L.C., Wilmington, Delaware. Counsel for Defendant Correctional Medical Services, Inc., now known as Corizon, Inc. and Ihuoma Chuks.

**MEMORANDUM OPINION**

July 31, 2015
Wilmington, Delaware

STARK, U.S. District Judge:

## I. INTRODUCTION

Plaintiff John Randolph DuPree, Sr. ("Plaintiff"), an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, filed this action on April 27, 2010, alleging constitutional violations pursuant to 42 U.S.C. § 1983. Presently before the Court are motions for summary judgment (D.I. 144, 145) filed by Plaintiff and Defendants Corizon, Inc. f/k/a Correctional Medical Services, Inc. ("CMS") and Ihuoma Chuks ("Chuks")[1] (together "Defendants"), Plaintiff's request for counsel (D.I. 145), and Plaintiff's motion for an extension of time to respond to Defendants' motion for summary judgment (D.I. 148).[2]

## II. BACKGROUND

Plaintiff raises a medical needs claim as a result of a skin condition that he alleges resulted in scarring and hospitalization. The Court reviewed and screened the original Complaint, dismissed some claims, gave Plaintiff leave to amend, and thereafter he filed an Amended Complaint. Upon motion by CMS, the Court dismissed all medical negligence claims. CMS then filed its first motion for summary judgment, which was denied based upon Plaintiff's representations that he would subpoena certain witnesses who could support his claim even without an expert witness and because there was an issue of fact as to whether policymakers at CMS knew of Plaintiff's medical need but delayed in responding to it. (D.I. 114, 115) The Court indicated that it would consider renewed motions for summary judgment by all parties. (*See id.*)

---

[1]Incorrectly named as Chucks Ihuoma.

[2]Plaintiff filed a response to Defendants' motion. The Court considers the response timely filed and, therefore, will deny as moot the motion for an extension of time.

1

Plaintiff was hospitalized in May 2009 "from nearly losing" his life as a "direct result from the neglect in medical treatment." (D.I. 2) At that time, he underwent "operations to remove the highly infectious mass" from his chest and neck. (*Id.*) Plaintiff alleges that CMS' policies/customs of cost avoidance were the driving force behind the indifference to his serious medical needs. (*See* D.I. 7 at 3) In addition, he alleges that CMS provided the least efficacious medical care for the purpose of saving money. (*See* D.I. 16 at ¶¶ 2, 4) Plaintiff seeks treatment by a dermatologist, prospective relief, declaratory relief, reimbursement for the preexisting medical condition, and compensatory and punitive damages.

Plaintiff was housed at the VCC during the relevant time. He has a skin condition that has been diagnosed as dermatitis, eczema, psoriasis, or lichen simplex.[3] (*See* D.I. 143 Ex. 1 at 16, 17, 60, 61) Treatment includes the use of ointment, such as triamcinolone cream[4] and oral antibiotics. (*See id.* at 13-23) Medical records describe a prescription for triamcinolone cream as "0.1% CR (15) apply on eczema lesions twice daily for 14 days then as needed for 60 days." (*Id.* at Ex. 2) Plaintiff was allowed to keep the medication on his person and, according to Plaintiff, a tube would probably last a week. (*See id.* at Ex. 1 at 22) Plaintiff testified that prescriptions typically were written for ninety days and, if the inmate did nothing, the prescription would lapse. (*See id.* at 26) When the medication ran low or was about to lapse, Plaintiff would submit a sick call slip to request renewal. (*See id.* at 66) Plaintiff testified that the medication should have been automatically reordered, but it was not. (*See id.* at 14) When he would ask for a reorder, it could take up to three months to get the

---

[3]Lichen simplex is a skin condition characterized by small, intensely pruritic papules. *The American Heritage Stedman's Medical Dictionary* 460 (2d ed. 2004).

[4]Triamcinolone acetonide cream is a topical corticosteroid that constitutes a class of primarily synthetic steroids used as anti-inflammatory and antipruritic agents. *See* http://www.rxlist.com/triamcinolone-cream-drug.htm (July 29, 2015)

2

medication. (*See id.* at 14) Plaintiff also testified that his physician would order the medication, but Plaintiff would not receive it. (*See id.* at 32)

Medical records indicate that Plaintiff was provided the cream on November 7, 2006 and that he received the requested medication again on December 30, 2006. (*See id.* at ¶ 6a) Medical records indicate the prescription was renewed at a higher strength cream. (*See is.* at Ex. 3 at Ex. A) Plaintiff was seen by a health care provider on March 28, 2007, two days after he submitted a sick call request, and his prescriptions were renewed. (*See id.* at Ex. 3 at ¶ 6b) Plaintiff received triamcinolone cream on May 2, 2007, May 31, 2007, and June 29, 2007, and the prescription for the medication expired on June 29, 2007 without a request for renewal. (*Id.* at ¶ 6c) Plaintiff submitted a sick call slip to request a refill on September 30, 2007, and the prescription was renewed as of October 19, 2007. (*See id.*) Plaintiff was next seen on November 9, 2007, and given another tube of the prescription cream. (*See id.*)

Plaintiff was seen by Dr. Van Dusen ("Dr. Van Dusen") on December 6, 2007. (*See id.* at ¶ 6d) Dr Van Dusen wrote a 90 day prescription for triamcinolone cream and stated "please send large tubes using to large area." (*Id.*) According to J. M. Courtney ("Courtney"), Corizon's Chief Operating Officer, SE, triamcinolone cream is typically dispensed in 15 gram tubes but is also available in an 80 gram tube if specially ordered. (*See id.*) Courtney states that typically the pharmacy only kept the 15 gram tube on hand, and it was expected to last thirty days. (*See id.*) Courtney further states that the 80 gram tube should have lasted Plaintiff for a five-month period up through April 2008. (*See id.*)

Pharmacy records indicate that the 80 gram tube was provided to Plaintiff around January 3, 2008. (*See id.* at Ex. 3 at Ex. A) Plaintiff was seen on January 7, 2008, but medical notes do not mention renewal of triamcinolone. (*See id.*) A March 25, 2008 pharmacy record shows a request for

3

the 80 gram tube, but that the medication was out of stock. (*See id.* at Ex. 3 at ¶ 6d) Plaintiff was next seen again on March 31, 2008, after submitting a grievance, but records do not reflect an order for the cream. (*See id.*) When Plaintiff was seen on April 1, 2008, his prescription for triamcinolone cream was renewed for the 15 gram tube, which was in stock. (*See id.*) An August 2008 medication administration record indicates that Plaintiff's prescription for Triamcinolone was for a 60 day period, with an order date of July 1, 2008 and a stop date of September 13, 2008. (*See id.* at Ex. 2)

Plaintiff received 15 gram tubes of triamcinolone cream on January 9, 2009, January 14, 2009, February 12, 2009, February 18, 2009, February 27, 2009 and March 20, 2009. (*See id.* at Ex. 3 at Ex. A) In 2009, Plaintiff was hospitalized and had surgery for cellulitis. Plaintiff testified that the hospitalization was the direct result of not receiving the prescribed creams at the VCC. (*See id.* at Ex. 1 at 39) The physicians at Kent General Hospital discovered the cellulitis. (*See id.* at 42) Plaintiff testified that no one at the VCC knew of his cellulitis because it did not present in a normal way. (*See id.* at 42) Plaintiff testified his current treatment is more consistent with less interruptions. (*See id.* at 18) At the time of his deposition, Plaintiff's symptoms were being treated. (*See id.* at 61)

Chuks, a nurse practitioner, states in her affidavit that Plaintiff was not limited in receiving medical care or skin cream products. (*See id.* at Ex. 6 ¶ 4) Chuks states that any delay or problem appeared to be a function of the time lapse between submitting a sick call slip and being scheduled to see a physician for non-emergency matters. (*See id.* at ¶ 3) She found no evidence of a problem with back-ordered or withheld medication. (*See id.*) In addition, Chuks opines that it was not the medical care that caused Plaintiff's hospitalization for cellulitis, explaining that cellulitis is a bacterial skin infection that in only half of cases is caused by bacteria entering the body through cuts, insect bites, or other skin injuries. (*See id.*) While a skin condition such as eczema may be a contributing factor in the development of cellulitis it is not the only factor. (*See id.*) The chances of developing

4

cellulitis are increased by a weakened immune system, a history of cellulitis and exposure to bacteria, including staphylococcus and streptococcus, which is often found in prison setting. (*See id.*) Chuks further states that there was no delay or denial of care and that a delay in medication did not cause or contribute to Plaintiff contracting cellulitis. (*See id.*)

Dr. Oketokun[5] has no independent recollection of Plaintiff or his medical treatment but states, to the extent she provided him medical care, it was appropriate for his condition and within the appropriate standard of care. (*See id.* at Ex. 7 at ¶¶ 5-6) Dr. Oketokun states that she did not delay in the receipt of medication and did not contribute to Plaintiff's cellulitis or hospitalization. (*See id.* at ¶ 6) Plaintiff was seen by other physicians whose affidavits state that they do not recall Plaintiff and indicate that they will not be providing expert opinions in this case. (*See* D.I. 143 Ex. 4)

According to Courtney, there is no evidence of back ordering problems for medication or intentional delay in delivery of skin cream. (*See id.* at Ex. 3 at ¶ 6c) Also according to Courtney, Plaintiff was seen numerous times by the health care providers and continually provided triamcinolone cream. (*See id.*) Courtney notes that the medical records reflect only one occasion, March 25, 2008, when the triamcinolone cream was not on hand when the Plaintiff sought renewal and, at the time, Plaintiff has been prescribed the 80 gram tube that was typically not kept on hand. (*See id.* at ¶ 4) The cost of the triamcinolone cream in question was $.68 for the 15 gram tube and $1.18 for the 80 gram tube. (*See id.*)

Plaintiff testified that he believed there was a corporate policy, custom or practice of placing cost containment ahead of medical care and that this policy somehow dictated medical providers delaying care and dispensing medication. (*See id.* at Ex. 1 at 32-33, 44, 51) Plaintiff testified there

---

[5]The United States Marshals Service has made several unsuccessful attempts to serve Dr. Oketokun. To date, she has not been served. Counsel for Defendants located Dr. Oketokun's place of employment and work phone number by putting her name into a Google internet search.

5

were many delays in getting medication to him and that he was not getting the medication he needed. (*See id.* at 20, 28) When asked to identify the corporate policy that he believed violated his constitutional rights, Plaintiff responded that his testimony regarding delay in receipt of medication was proof of the policy. (*See id.* at 44-46) Plaintiff has not seen any written document or policy, but testified that he will prove the policy through CMS' history. (*See id.* at 32-33, 46) Conversely, Courtney states that Corizon does not maintain a policy or custom of cost avoidance and did not provide the least efficacious medical care to Plaintiff for the purpose of saving money. (*See id.* at Ex. 3 at ¶ 3) Courtney reviewed a drug utilization chart for Plaintiff, and states that he found no systematic delay in providing medication to Plaintiff. (*Id.* at ¶ 4)

CMS moves for summary judgment on the grounds that: (1) the statute of limitations bars claims accruing two years before the suit; (2) Plaintiff failed to develop any evidence to establish a violation of his constitutional rights as a result of medical care he received; (3) Plaintiff failed to obtain expert testimony to support his theory that limited access to anti-itch skin cream resulted in a serious injury or illness; and (4) Plaintiff failed to establish that an existing custom, policy, or practice of CMS resulted in the violation of a constitutional right. (D.I. 142, 144) Plaintiff opposes the motion, arguing that: (1) Defendants conceal the truth concerning their deliberate use of cost savings at the expense of inmates; (2) CMS failed to provide any form of credible evidence to prove that its actions were in good faith or that its actions rise to the professional standard of treatment; (3) he has never agreed that he received appropriate medical care; (4) the issue is about "not receiving adequate, appropriate, or reasonable treatment" from Defendants in their attempt to save company money; and (5) he has submitted factual and admissible evidence by many trained experts via exhibits. In addition, it appears that Plaintiff moves for summary judgment either against

6

Defendants or Dr. Oketokun on the grounds that Dr. Oketokun failed to respond or meet the discovery time-frames as ordered by the Court. (D.I. 145, 146)

## III. LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). An assertion that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The same standards and burdens apply on cross-motions for summary judgment. *See Appelmans v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

## IV. DISCUSSION

### A. Statute of Limitations

Defendants contend that a majority of Plaintiff's claims are time-barred. Plaintiff counters

7

that his claims are not time-barred, and that the Court ruled on this issue in his motion for reconsideration.

Plaintiff is correct. The Court previously determined that the claims were not time-barred, by reason of tolling. (*See* D.I. 17, 18) The Court will not revisit the issue again.

**B.    Medical Needs**

The Court previously determined that Plaintiff raised the following issues: (1) CMS' policies/customs of cost avoidance were the driving force behind the indifference to Plaintiff's serious medical needs; and (2) CMS provided the least efficacious medical care for the purpose of saving money. Plaintiff frames the issue as about "not receiving adequate, appropriate, or reasonable treatment" from Defendants in their attempt to save company money. (D.I. 149) Defendants argue that summary judgment is appropriate because Plaintiff failed to develop any evidence to establish a constitutional violation of his rights as a result of the medical care he received.

The Eighth Amendment proscription against cruel and unusual punishment requires that prison officials provide inmates with adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103-105 (1976). In order to set forth a cognizable claim, an inmate must allege a serious medical need and acts or omissions by prison officials that indicate deliberate indifference to that need. *See id.* at 104; *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle*, 429 U.S. at 104-05; *see also Monmouth Cnty. Corr. v. Lanzaro*, 834 F.2d 326, 346-47 (3d Cir. 1987) (deliberate indifference can be shown when medical treatment is delayed for non-medical reasons).

"[A] prisoner has no right to choose a specific form of medical treatment," so long as the treatment provided is reasonable. *Lasko v. Watts*, 373 F. App'x 196, 203 (3d Cir. Apr. 12, 2010) (quoting *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000)). An inmate's claims against members of a prison medical department are not viable under § 1983 where the inmate receives continuing care, but believes that more should be done by way of diagnosis and treatment and maintains merely that options available to medical personnel were not pursued on the inmate's behalf. *See Estelle*, 429 U.S. at 107. Finally, "mere disagreement as to the proper medical treatment" is insufficient to state a constitutional violation. *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (citations omitted).

Plaintiff argues that he did not receive adequate, appropriate, or reasonable treatment from Defendants in their attempt to save company money. Plaintiff points mainly to the delay in receiving prescription cream for his skin condition. He argues that the medical records reveal posting of the medication physicians prescribed and/or ordered, but there are ten instances when he did not sign for the medication. The record reflects that Plaintiff was seen on numerous occasions by medical staff, prescribed medication, and received medication. It further reflects that Plaintiff used the cream more heavily than expected, given that Plaintiff testified that a tube would last a week, when the medical authorities expected a tube to last thirty days. In addition, Plaintiff received outside medical care when it became necessary, albeit on an apparently emergent basis.

Even when viewing the evidence in the light most favorable to Plaintiff, no reasonable jury could find Defendants were deliberately indifferent to Plaintiff's medical needs. The record reveals that, at most, if anything, there may have been some negligence in not providing Plaintiff with the triamcinolone cream on a more timely basis (although the Court does not, and need not, make such

9

finding). Negligence, however, is insufficient for a finding of a violation of Plaintiff's constitutional rights.

Therefore, the Court will grant Defendants' motion for summary judgment on this issue and will deny Plaintiff's motion for summary judgment (to the extent that is the intent of his motion at D.I. 145).

### C. Expert Testimony

CMS contends that summary judgment is appropriate because Plaintiff failed to present expert testimony to support his theory that limited access to skin cream resulted in a serious injury or illness. Plaintiff responds that he has submitted factual and admissible evidence by many trained experts via exhibits.

"Where the jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts, the jury itself is allowed to supply the applicable standard of care and thus to obviate the necessity for expert testimony relative thereto." *Natale v. Camden Cnty. Correc. Facility*, 318 F.3d 575, 579 (3d Cir. 2003) (citations omitted). The factual predicate for a common knowledge case is one where "the carelessness of the defendant is readily apparent to anyone of average intelligence and ordinary experience." *Id.* A prisoner's claim of deliberate indifference to a serious medical need requires expert testimony when the seriousness of the injury or illness would not be apparent to a lay person. *See Boring v. Kozakiewicz*, 833 F.2d 468, 473-74 (3d Cir. 1987) (concluding that jury would not be in position to decide whether ulnar nerve injury, scalp condition, knee disorder, and migraine headaches could be classified as "serious").

Cellulitis is a medical condition that could be considered a "serious medical condition." *See Monson v. Corizon*, 2013 WL 3756440, at *13 (D. Idaho July 11, 2013). Indeed, Plaintiff was

10

hospitalized because of the condition. The Court agrees that expert testimony is essential, at least as to the issue of cellulitis, as a lay person could not reasonably determine without the assistance of an expert whether a delay in the receipt of triamcinolone cream resulted in cellulitis.

Plaintiff argues that medical treatment and/or delay of treatment caused him to develop cellulitis, be hospitalized, and require surgery for the condition, while Defendants contend otherwise. The proper resolution of this dispute would not be apparent to a lay person without the guidance of a medical expert. The Court previously denied CMS' motion for summary judgment because Plaintiff had moved to subpoena certain treating physicians and because Defendants Chuks and Dr. Oketokun are medical personnel who could potentially serve as fact witnesses sufficient to support Plaintiff's claim. (*See* D.I. 114, 115) The record now contains affidavits of treating physicians, both of whom indicate they have no opinions on whether the care provided contributed to Plaintiff's hospitalization.[6]

Based upon the foregoing discussion, the Court finds that summary judgment for Defendants is proper due to Plaintiff's failure to obtain expert testimony supporting his claims. *See Jackson v. Ivens*, 565 F. App'x 115 (3d Cir. Apr. 30, 3014). In addition, the Court will deny Plaintiff's motion for summary judgment on this issue (to the extent that is the intent of his motion at D.I. 145).

### D. Policy, Custom, Practice

Defendants move for summary judgment on Plaintiff's claim that CMS had a custom or policy that violated his constitutional rights. In opposition, Plaintiff refers to an investigation by the the United States Department of Justice regarding conditions and practices at several prisons in the State of Delaware, as well as numerous newspaper articles. When a plaintiff relies upon a theory of

---

[6]Defendants also provided affidavits from Chuks and Dr. Oketokun on the issue.

11

respondeat superior to hold a corporation liable, he must allege a policy or custom that demonstrates such deliberate indifference. *See Sample v. Diecks*, 885 F.2d 1099, 1110 (3d Cir. 1989); *Miller v. Correctional Med. Sys., Inc.*, 802 F. Supp. 1126, 1132 (D. Del. 1992). In order to establish that CMS is directly liable for the alleged constitutional violations, Plaintiff "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]." *Natale*, 318 F.3d at 584 (stating that because respondeat superior or vicarious liability cannot be basis for liability under 42 U.S.C. § 1983, corporation under contract with state cannot be held liable for acts of its employees and agents under those theories).

Assuming the acts of a CMS employee have violated a person's constitutional rights, those acts may be deemed the result of a policy or custom of the entity for whom the employee works, thereby rendering the entity liable under § 1983, where the inadequacy of existing practice is so likely to result in the violation of constitutional rights that the policymaker can reasonably be said to have been deliberately indifferent to the need. *See Natale*, 318 F.3d at 584 (citations omitted). "'Policy is made when a decisionmaker possess[ing] final authority to establish . . . policy with respect to the action issues an official proclamation, policy or edict.'" *Miller*, 802 F. Supp. at 1132 (alteration in original) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (citing *Andrews*, 895 F.2d at 1480; *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989)).

Because Plaintiff has not shown a violation of his constitutional right to medical care, the Court need not address whether he has shown that a violation was the result of a policy or custom of CMS. *See Jackson*, 565 F. App'x at 118; *see also Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 113 (3d Cir. Jan. 19, 2007) (policy makers not liable for prison medical staff's alleged deliberate

indifference to prisoner's serious medical needs, given that there was no underlying violation of prisoner's rights, so policy makers did not establish or maintain unconstitutional policy or custom responsible for violating prisoner's rights).

Accordingly, the Court will grant the motion for summary judgment to Defendants on the issue of whether CMS had a custom, policy, or practice resulting in a violation of a constitutional right and will deny Plaintiff's motion for summary judgment (to the extent that is the intent of his motion at D.I. 145).

### E. Dr. Oketokun

Despite repeated attempts by the United States Marshals Service and assistance from the Court, Dr. Oketokun has yet to be served. As of December 15, 2014, she had not been served. (*See* D.I. 141) Defendants advise that they were able to locate her using a Google search, and they subsequently obtained an affidavit from Dr. Oketokun in support of their motion for summary judgment. (*See* D.I. 143 Ex. 7) In an apparent response to Defendants' efforts to locate Dr. Oketokun, Plaintiff moves for summary judgment on the ground that she failed to respond or meet the time-frames as ordered by the Court for discovery. (D.I. 145) Plaintiff supports his motion with his affidavit, which states Dr. Oketokun has had ample time to respond to the Court's May 16, 2014 scheduling Order (D.I. 121), and his formal complaint.

Defendants oppose the motion on the ground that Dr. Oketokun has never been served with process and is not a proper party. In addition, they note that Plaintiff failed to produce any evidence to establish that Dr. Oketokun violated Plaintiff's constitutional rights. For this reason, Defendants add that – although Dr. Oketokun has not been an active party in the case – the grant of summary judgment in their favor should apply to Dr. Oketokun.

13

Plaintiff has provided no meritorious basis to grant his motion for summary judgment. Therefore, the Court will deny his motion. Further, given that the evidence of record does not support a finding of deliberate indifference to Plaintiff's serious medical needs, the Court will summarily dismiss the claims raised against Dr. Oketokun.

## V. CONCLUSION

For the above reasons, the Court will: (1) grant Defendants' motion for summary judgment (D.I. 144); deny Plaintiff's motion for summary judgment (D.I. 145); and (3) deny as moot Plaintiff's request for counsel (D.I. 145) and motion for extension of time to file a response (D.I. 148). In addition, the Court will dismiss the claims against Dr. Oketokun.

An appropriate Order follows.